## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| MEGA MILLIONS MUSIC, LLC | CIVIL ACTION FILE NO. |
| Plaintiff, | COMPLAINT AND JURY DEMAND |
| v. | |
| NOAH OLIVER SMITH p/k/a "YEAT", LISTEN TO THE KIDS DISTRIBUTION, LLC, FIELD TRIP RECORDINGS, LLC, and DOES 1 through 50 | |
| Defendants. | |

## COMPLAINT

COMES NOW Plaintiff MEGA MILLIONS MUSIC, LLC ("Plaintiff" or "Mega Millions"), by and through undersigned counsel, and hereby files this Complaint against Defendants Noah Oliver Smith p/k/a "Yeat" ("Artist" or "Smith"), Listen to the Kids Distribution, LLC ("The Kids"), Field Trip Recordings, LLC ("Field Trip") and DOES 1 through 50 (collectively, the "Defendants"). In support thereof, Plaintiff alleges as follows:

## NATURE OF THE ACTION

1.    Joseph Lipsey IV ("Lipsey"), known for his entrepreneurial prowess and investment acumen in the entertainment sphere, serves as the principal of Plaintiff Mega Millions. Under his leadership, the company has collaborated with a diverse range of artists. Lipsey's provision of capital and his strategic foresight have

773770\07690\164719922.1

been instrumental in the efficacious development and advancement of both underground artists and emerging talents.

2.      Lipsey, recognizing the potential in Defendant Smith as an emerging talent, initiated Defendant Smith's engagement with Plaintiff, with the aim of facilitating the development and professional trajectory of his music career. Plaintiff entered into an exclusive Recording Agreement with Defendant Smith. This endeavor encompassed, *inter alia*, the allocation of substantial financial resources and the deployment of ancillary assets at Lipsey's disposal.

3.      As further delineated below, Section 3 of the Recording Agreement requires Artist to record and deliver an Album, defined as at least 10 original new master recordings with a total duration of 45 minutes, which Artist has not yet completed. Under its Section 2, the Recording Agreement's exclusive First Contract Period therefore remains active, providing Mega Millions with a multitude of ongoing exclusive rights. In addition to the initial term, Mega Millions also has four exclusive option Contract Periods, which it intends to exercise upon completion of the First Contract Period. As such, the Recording Agreement's exclusivity terms remains active, and will continue to remain active for the foreseeable future.

4.      Section 6(a) of the Recording Agreement grants Mega Millions **exclusive ownership** of all Recordings embodying Artist's performances which are made during the Term, and 6(b) grants **exclusive distribution rights**, together with

2

Section 9 granting Mega Millions ***exclusive mechanical rights*** in the Compositions. Section 17 of the Recording Agreement further permits Mega Millions to independently distribute or enter into Distribution Agreements and gives Mega Millions passive participation rights in any Successor Distribution Agreement. Plaintiff therefore maintains right of participation in any upstream of the Recordings, even beyond its exclusive ownership rights of Recordings made during the Term and distribution rights during the Term. Furthermore, Plaintiff retains ***exclusive co-publishing right*** in all Compositions pursuant to Section 10 of the Recording Agreement and its Exhibit A.

5.      Under Section 13(b)(i), Defendant Smith expressly agreed that during the Term Artist "***shall not enter into any agreement which would interfere with the full and prompt performance of his obligations***" under the Recording Agreement, and that Artist "***shall not perform or render any services as a recording artist for the purpose of making Records or Master Recordings for any Person other than***" Mega Millions. Tellingly, Section 13(b)(ii) extends this restriction by virtue of Artist's express agreement not to record or otherwise distribute any Composition or Record through other channels or labels, such as Defendants, for the later of 5 years subsequent to Delivery to Mega Millions of the Master containing such Composition or the date 2 years subsequent to the expiration of the Agreement's or a subsequent

agreement's Term. In the event of any such breach, Sections 13(b)(iv) and 20 provide Mega Millions with injunctive and equitable relief rights.

6.      Notwithstanding the endeavors undertaken by Plaintiff, Defendant Smith has elected to deliberately breach his agreement with Plaintiff, by intentionally abrogating his duties, and thereby inflicting considerable detriment upon the Plaintiff in terms of finances, reputation, and emotional distress. In addition, Defendant Smith actively sought to subvert the Plaintiff's enterprises through actions characterized by fraudulence and duplicity. This Action arises out of a series of contractual breaches, tortious conduct, and the unauthorized exploitation of Plaintiff's exclusive rights by the Defendants, which have caused significant damages to Plaintiff.

7.      Plaintiff seeks redress for, *inter alia*, breach of contract, breach of the covenant of good faith and fair business dealing, tortious interference with a contract, fraudulent misrepresentation, negligent misrepresentation, promissory estoppel, unjust enrichment, conversion, and false designation of origin and unfair competition. Plaintiff also prays for a declaration that the Recording Agreement between the parties is valid and enforceable and that the parties remain obligated to perform thereunder, equitable accounting and to obtain injunctive relief against further violations of its exclusive rights.

## THE PARTIES

8.      Plaintiff is a limited liability company organized under the laws of the State of Tennessee with a principal place of business located in Puerto Rico. Plaintiff is engaged in the business of music production, recording, and artist management.

9.      Plaintiff is informed and believes, and on that basis alleges that Defendant Smith is an individual living in Lake Oswego, Oregon and doing business in and with the State of Georgia, including in this district.

10.      Plaintiff is informed and believes, and on that basis alleges that Defendant Field Trip is a limited liability company organized under the laws of the State of California and does business in and with the State of Georgia and with this District. Defendant Field Trip may be served through its registered agent GABRIEL SIMHA located at 9663 SANTA MONICA BLVD, 1102, BEVERLY HILLS, CA 90210 or by any other means under Georgia law.

11.      Plaintiff is informed and believes, and on that basis alleges that Defendant The Kids is a limited liability company organized under the laws of the State of Delaware and does business in and with the State of Georgia and with this District. Defendant The Kids may be served through its registered agent CONOR AMBROSE located at 4617 W WASHINGTON BOULEVARD, LOS ANGELES, CA 90016.

12.    Plaintiff is informed and believes, and on that basis alleges that Does 1-50 are persons or entities responsible in whole or in part for the wrongdoing alleged herein ("Doe Defendants"). Each of the Doe Defendants participated in, ratified, endorsed, and/or was otherwise involved in the acts complained of, and they have liability for such acts. Plaintiff will amend this Complaint if and when the identities of such persons or entities and/or the scope of their actions become known.

13.    Plaintiff is informed and believe, and on that basis allege, that at all times relevant herein, Doe Defendants, inclusive, were the alter ego of each other and of all of the relevant entities that they directly or indirectly controlled and each of them, and that such a unity of interest and ownership existed between them that separate personalities have not in reality existed; and there would be an inequitable result if the acts and omissions at issue in this case were treated as those of any of the Doe Defendants alone. Plaintiff is further informed and believes that Doe Defendants commingle funds and assets among themselves, that Doe Defendants have identical, nearly identical or effectively identical owners, that the Doe Defendants have the same offices, directors, and officers and that the Doe Defendants use one another as a mere shell or conduit for the affairs of one another.

14.    In addition, Plaintiff is informed and believe that each of the Doe Defendants disregard corporate formalities, share employees, and each transfer assets or properties away and/or create or shift liabilities so that each may be left

with insufficient capital to meet the needs of each entity's business and its liabilities and without consideration to the detriment of the entity's creditors.

15.    Plaintiff is informed and believe, and on that basis alleges, that each of the Doe Defendants were the agents, servants, employees, or in some other legal relationship to the others, whereby legal liability is imputed from one party to the other, and at all relevant times, each of the Doe Defendants were acting within the course and scope of their agency, servant, or employment relationship.

## JURISDICTION AND VENUE

16.    This is an action for breach of contract based on Defendant Smith's material breach of the Recording Agreement executed between Plaintiff and Defendant Smith and to address Defendants' wrongful conduct set forth more fully herein.

17.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, as there is complete diversity of citizenship between Plaintiff and Defendants and the amount in controversy exceeds $75,000, exclusive of interest and costs. Additionally, the Court has subject matter jurisdiction over this action pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201 et seq.

18.    The Court has personal jurisdiction over Defendant Smith because the Recording Agreement, as defined below, was entered into in this judicial district and the parties agreed the validity, interpretation, and legal effect of the Recording

Agreement would be governed by the laws of the State of Georgia and that any controversy arising from the Recording Agreement would be adjudicated in the courts located in Atlanta, Georgia.

19.    As for the remaining Defendants, this court has personal jurisdiction as they have committed acts causing injury to Plaintiff within this district and have sufficient minimum contacts with the forum, such that the exercise of jurisdiction over them would not offend traditional notions of fair play and substantial justice.

20.    Venue is proper in this district under 28 U.S.C. § 1391(b) in that a substantial part of the events or omissions giving rise to the claims arise in this judicial district. Venue is also proper in this district because the parties agreed that the federal courts located in Atlanta, Georgia would have exclusive jurisdiction.

## FACTS COMMON TO ALL CLAIMS FOR RELIEF

### *Background*

21.    On or around October 30, 2019, Defendant Smith and his then-manager, Justin Gallego a/k/a "Nextel" ("Gallego"), were introduced to Lipsey through a mutual friend, Cameron Okoneski ("Cam"). Lipsey and Cam were planning to work with more artists under the doing business as (d/b/a) designation "Mega Millions," and began discussing the possibility of working with Defendant Smith and Gallego. Around this time, Defendant Smith introduced his music to

Lipsey and expressed his desire to achieve success as a recording artist in the challenging music industry.

22.    On or around November 4, 2019, Lipsey, Cam, Gallego and Defendant Smith held a conference call discussing various facets of Defendant Smith's music career. These conversations included topics such as Defendant Smith's music, Lipsey's plans to utilize his resources in Chattanooga, Tennessee for Mega Millions, recording contract terms, and the financial support needed for Defendant Smith's career and personal obligations.

23.    Thereafter, Defendant Smith was eager to enter a contract with Plaintiff. Lipsey informed Gallego and Defendant Smith that he would have a contract prepared by his attorney to formalize Plaintiff's relationship with Defendant Smith and begin their collaboration.

### *Execution of the Recording Agreement*

24.    On or around November 6, 2019, in a group chat that was created between Lipsey, Cam, Defendant Smith and Gallego, Cam states, "[w]hen does ur streamcut deal end" in which Gallego replies, "[w]e already dropped from them" and Defendant Smith affirmatively replies, "[i]m out of it now…." Cam requests their "contractual agreement [between Gallego and Defendant Smith] so we can have our attorneys make sure we don't have conflicting interest" and Cam then

states, "[t]hank god u outta streamcut." Defendant Smith then replied, "[w]e don't have a contract lol."

25.    On or around November 7, 2019, Defendant Smith, exhibiting a keen desire to initiate work with Lipsey prior to the execution of a formal agreement, expressly requested the scheduling of a demo session at Penthouse Recording Studio NYC. In response to this request and reliance on the forthcoming execution of the Recording Agreement, Lipsey undertook the payment for said session.

26.    On or around November 10, 2019, Defendant Smith, with a continuance of insistence, directed that another studio session should be scheduled on the 11th of November, with Lipsey again assuming the financial obligation for the session prior to the ratification of a formalized agreement between the parties but in reliance of same.

27.    On or around November 12, 2019, after Gallego expressed Defendant Smith's intent to execute an agreement with Plaintiff the next day, Lipsey inquired about a review of the agreement by Defendant Smith's legal counsel. Gallego affirmed that the agreement would be reviewed by an attorney within his office prior to execution.

28.    On or around November 14, 2019, Lipsey informed Defendant Smith and Gallego of a delay in finalizing the agreement due to his attorney's ongoing conflicts check. Gallego questioned the necessity of the conflicts check by stating,

"Word, with what, [Defendant Smith] has no other contracts," a sentiment adopted by Defendant Smith with a reply of "Word word."

29.    On or around November 15, 2019, Defendant Smith insisted on the scheduling of another studio session to be held the next day, the cost of which was again borne by Lipsey in reliance of Artist's promise to execute the Recording Agreement. Additionally, on this date, Cam notified Defendant Smith and Gallego that the conflicts check had been concluded and that the contract was in the process of being sent out. In response to this update, Gallego communicated his intention to have the contract reviewed by a lawyer that same night.

30.    On November 20, 2019, Lipsey sent an exclusive recording agreement (the "Recording Agreement") to Defendant Smith and Gallego. Lipsey explicitly stated, "I highly advise as you said you were going to do to go over it with an attorney. Once y'all go over it, we can start negotiations if they are needed." Gallego replies, "[do you] know who Steven [referring to Steven Victor] is? Lol, He [is] an attorney too." Gallego and Defendant Smith then proposed a change of the financial terms in the Recording Agreement. Lipsey stated he would discuss and confirm the proposed financials with his father, Joseph Lipsey III.

31.    On or around November 25, 2019, Defendant Smith made a request to Lipsey for an advance payment to cover his rent during the period in which the Recording Agreement was undergoing revision, as well as for the cost of another

studio session scheduled for the same day. Lipsey agreed and transferred the specified rental amount and session cost to Defendant Smith in reliance on the Artist's promise to execute the Recording Agreement.

32.     On or around November 27, 2019, Lipsey informed Defendant Smith that his father had approved the financial terms of the Recording Agreement, specifically the advance of $5,000 and a monthly payment of $1,250, thereby greenlighting the progression towards the execution of the Recording Agreement.

33.     On or around December 6, 2019, Defendant Smith suggested Lipsey should allocate funds for videographers and features. During this discussion, the parties reached a mutual understanding that the Recording Agreement was ready for execution and that there was no further need for delay. This discussion included Lipsey's commitment to pay the agreed-upon advance and to cover Defendant Smith's monthly rental expenses.

### *Terms of the Recording Agreement*

34.     On December 6, 2019, Defendant Smith electronically executed the Recording Agreement with Plaintiff (1) to provide his exclusive recording services to Plaintiff for the purpose of making "Master Recordings" embodying his performances; (2) to provide Plaintiff with a co-publishing interest and administration rights with respect to any musical compositions written in whole or in part by Defendant Smith; and (3) to grant Plaintiff with, among other rights,

exclusive merchandising and video rights. A true and correct copy of the Recording Agreement is attached hereto as **Exhibit "A"**.

35.    Specifically, the parties agreed that "[Plaintiff] hereby engages [Defendant Smith's] exclusive personal services as a recording artist in connection with the recording and production of Records and Videos and [Defendant Smith] hereby accept[s] such engagement and agree[s] to exclusively render such services solely for the benefit of [Plaintiff] in the Territory during the Term and all extensions and renewals thereof."

36.    Section 2 of the Recording Agreement set forth the term as "a first contract period (the "'First Contract Period') ending on the earlier of: (A) twelve (12) months after the Delivery to [Plaintiff] of the last Master Recording required for Delivery in fulfillment of the Minimum Recording Commitment (defined below) during the First Contract Period; or (B) nine (9) months after the initial commercial release in the United States of the Album required for Delivery in fulfillment of the Minimum Recording Commitment during the First Contract Period." Additionally, the Recording Agreement provided that [Plaintiff] would have the right to "four (4) separate, irrevocable, successive and consecutive options to "extend the Term for additional option or renewal contract periods."

37.    Importantly, the Recording Agreement provides that "if, as of the date when the then current Contract Period would otherwise have expired, [Plaintiff] has

neither exercised its option to extend the Term for a further Contract Period nor notified [Defendant Smith] that [Plaintiff] does not wish to exercise such option, then: (A) you shall immediately notify [Plaintiff] (and, if applicable, the Distributor) that its option has not yet been exercised (an 'Option Warning'); (B) [Plaintiff] shall be entitled to exercise its option at any time before receiving the Option Warning or within fifteen (15) business days thereafter; and (C) the current Contract Period shall be deemed to have continued until [Plaintiff] exercises its option or until the end of such fifteen (15) day period (whichever shall occur first). Nothing contained herein shall limit [Plaintiff's] right to exercise an option at any time if [Defendant Smith] fail[s] to send [Plaintiff] an Option Warning in accordance with this subparagraph."

38.     Additionally, Section 3(a)(iii) provides "[d]uring each Contract Period, [Defendant Smith] shall render [his] services to [Plaintiff] in accordance with the terms and conditions hereof, in connection with recording a sufficient number of Masters to constitute one (1) Album (the 'Minimum Recording Commitment')."

39.     Section 24(b) defines "Album" as "a sufficient number of Masters embodying [Defendant Smith's] performances to comprise one (1) or more Compact Discs, or the equivalent, of not less than forty-five (45) minutes of playing time and containing at least ten (10) different Compositions, or such other definition of "album" as may be contained in [an] applicable Distribution Agreement."

40.     As compensation for Plaintiff's services and financial commitment to Defendant Smith's career, Plaintiff was entitled to receive a percentage of the monies earned by Defendant Smith, including a portion of advances for Master Recordings and ancillary income. The Recording Agreement provides that each party is entitled to receive 50% of any record royalties and/or advances received from a third-party distributor and 20% of gross monies earned from ancillary activities. "Ancillary activities" are defined in Section 18(b) of the Recording Agreement as "(i) endorsements, sponsorships, advertisements, branding, strategic partnerships or other third party entertainment business relationships; (ii) [Defendant Smith's] services rendered as an actor or performer (in any and all media, including, without limitation, film and television); (iii) [Defendant Smith's] services rendered as a producer, mixer or remixer of master recordings; books, magazines and other publishing materials written by or about [Defendant Smith], including music publishing (subject to subparagraph 18(a) above); (iv) services rendered by [Defendant Smith] that result in the making, promoting, broadcasting or marketing of recordings or records for others; and (v) each live event at which [Defendant Smith] perform[s] or otherwise appear[s] (including any corporate or other private show).

41.     Section 20 of the Recording Agreement provides that Defendant Smith "acknowledge[s] that [Defendant Smith's] services hereunder, as well as the Master

Recordings recorded and the rights and privileges granted to [Plaintiff] under the terms hereof, are of a special unique, unusual, extraordinary and intellectual character which gives them a peculiar value, and that, ***in the event of a breach by [Defendant Smith] of any material term, condition, representation, warranty or covenant contained herein, [Plaintiff] may be caused irreparable injury and damage. [Defendant Smith] expressly agree[s] that [Plaintiff] shall be entitled to seek the remedies of injunction and other equitable relief to prevent or remedy a breach of this Agreement, which relief shall be in addition to any other rights or remedies, for damages or otherwise, which [Plaintiff] may have."*** (Emphasis added).

42.    Finally, Section 23 of the Recording Agreement provides that: "no amendment to or modification, waiver, termination or discharge of this Agreement or any provision thereof shall be binding upon the parties hereto unless confirmed by a written instrument signed by an authorized signatory of each party. A waiver by either party of any term or condition of this Agreement in any instance shall not be deemed or construed as a waiver of such term or condition for the future, or of any subsequent breach thereof."

*Initial Breaches of the Recording Agreement*

43.    Promptly following the execution of the Recording Agreement, Plaintiff continued working to ensure that Defendant Smith would achieve the highest level of success possible.

44.    Although Lipsey, acting on behalf of Plaintiff, had already been conducting business with Defendant Smith and other artists under the d/b/a "Mega Millions," Plaintiff formally organized the company under the laws of the State of Tennessee on December 17, 2019. The parties then collaborated to record and produce approximately fifty (50) singles and eight (8) videos.

45.    On or around January 3, 2020, Defendant Smith delivered, and Plaintiff commercially released, a project entitled, "I'm So Me" ("Project 1"). Project 1 comprised a compilation of thirteen (13) Master Recordings, collectively spanning an approximate total duration of thirty-three (33) minutes.

46.    In accordance with the terms delineated in Section 24(b) of the Recording Agreement, Project 1 did not satisfy the requisite minimum duration of forty-five (45) minutes for an "Album" as explicitly defined and stipulated in the Recording Agreement.

47.    On or around February 3, 2020, Lipsey was informed by Defendant Smith and Jordan Walker a/k/a "J Rich" ("Walker") that Defendant Smith was still

under an agreement with Streamcut, a digital music rights collection and administration company.

48.    Devastated by this information, Lipsey made all efforts to amicably resolve the contract issue with Streamcut while having to suspend the future release plans for Defendant Smith's music and videos per Section 16 of the Recording Agreement to prevent the risk of lost profits by a third-party claimant, as he thought was the case.

49.    On or around February 10, 2020, in response to Defendant Smith's request to schedule a studio session, Lipsey informed Defendant Smith that he was currently waiting to hear back from his attorney for legal advice concerning his contractual rights with Defendant Smith in relation to his purported Streamcut agreement. Defendant Smith replied, ". . . So in the meantime [I] cant record?" and Lipsey responded, "I would just stay put and get content." Thereafter, the parties mutually agreed that they would wait until July to fully resume their plans for future music and video releases as contemplated under the Recording Agreement.

50.    Nevertheless, Defendant Smith persisted in recording music and producing videos, while refraining from releasing anything commercially. Meanwhile, Plaintiff consistently bore the financial responsibilities for Defendant Smith's recording sessions, video production, food expenses and rental costs.

51.     On or around February 29, 2020, Defendant Smith and Lipsey engaged in a brief verbal altercation, in which Defendant Smith conveyed frustration about Lipsey's communication style and promptness in covering expenses. Conversely, Lipsey shared his apprehensions about working with Defendant Smith, given that he was led to believe that Defendant Smith was free to enter a contract. Lipsey also voiced concerns that Defendant Smith might be leveraging his efforts merely as a steppingstone to further his career with another party. In response to these concerns, Defendant Smith promised Lipsey, "you dont have to worry like [I] told you im rocking with you. And im fully down to do whatever u wanna do… I dont want to go and sign with someone else [I] wanna work [with you]."

### *Los Angeles and the Encino Mansion*

52.     In reliance on Defendant Smith's assurances, Plaintiff continued to assume the full cost and obligations as a music label would with regard to Defendant Smith and as described in the terms and conditions of the Recording Agreement.

53.     On or around June 1, 2020, Plaintiff assisted Defendant Smith in moving to Los Angeles, California to utilize the city's vibrant music scene and expand Defendant Smith's network and relationships with up-and-coming artists. While in Los Angeles, Plaintiff continued to cover costs and expenses of Defendant Smith.

54.    On or around March 15, 2021, to further advance Defendant Smith's music career, Plaintiff, though its affiliated company and its principal, leased and funded a newly constructed 8,000 square foot mansion located at 16818 Encino Hills Drive, Encino, CA 91436 (the "Encino Mansion"). In sum, Plaintiff spent hundreds of thousands of dollars on the Encino Mansion project, including, but not limited to, $400,000 for rent; $100,000 for furnishing, amenities, and miscellaneous housing costs; and $100,000 to hire videographers, photographers, and provide the residence with state-of-the-art production equipment. A true and correct copy of the Encino Mansion lease agreement is attached hereto as **Exhibit "B"**.

55.    The Encino Mansion was leased and funded by Plaintiff's affiliated entity and principal for the benefit of Defendant Smith and was strategically employed as a hub for congregating a diverse array of individuals, including but not limited to Defendant Smith, other artists, entrepreneurs, and influencers. The primary objective of the Encino Mansion was to facilitate the production of music for Defendant Smith, foster collaboration of Defendant Smith with popular content creators, and undertake television and film projects.

56.    In concert with a cadre of influencers, Defendant Smith availed himself of the Encino Mansion as a venue and available residence for recording musical compositions, content creation, networking, and collaborating with influencers, business professionals and a multitude of other visitors who frequented the Encino

Mansion. Due to his collaboration with content creators and other artists at the Encino Mansion, utilizing Plaintiff's resources and efforts, Defendant Smith quickly gained popularity as an emerging Artist.

57.    Due to the rigorous demands of Lipsey's work and academic commitments and his direct engagement in the operational management of his newly founded influencer enterprise, EKHO Inc. ("EKHO"), Lipsey delegated oversight of the Encino Mansion's operations to Joseph Adeife ("Adeife"), who also serves as legal counsel for Plaintiff in the State of California.

58.    On or around April 2, 2021, without the knowledge or consent of Lipsey, and absent any authorization from the Plaintiff in direct contravention of the Recording Agreement, Defendant Smith released a project titled "Alive" ("Project 2"). This compilation encompassed a total of twenty-two (22) Master Recordings falling under the purview of the Recording Agreement.

### *Plaintiff's Dealings with Mark Wahlberg*

59.    After the release of Project 2, Adeife, in his capacity as legal counsel for Plaintiff, consulted with his professional associate, Daniel Weadock ("Weadock"), concerning use of the Encino Mansion. These discussions centered on the potential formulation of a television production and collaboration with F45, a fitness brand owned by Mark Wahlberg ("Wahlberg"). The project was to feature a selection of influencers and Defendant Smith curated by EKHO and Plaintiff,

alongside the distinguished actor Wahlberg, with the objective of creating a program akin to the "Entourage" series (the "Encino Project").

60.    In the course of these deliberations, Weadock facilitated an introduction between Adeife and Phillip Thomas a/k/a "Rasta Phil" ("Thomas"), a long-standing associate of Wahlberg. Additionally, Weadock acquainted Adeife with Eric Weinstein ("Weinstein"), who functions as Wahlberg's production partner and manager.

61.    On or around June 10, 2021, Weadock, along with Weinstein and Thomas, convened with Adeife and Cam at the Encino Mansion to discuss the Encino Project. Defendant Smith and Gallego were also present at the Encino Mansion, as Defendant Smith knew Plaintiff and EKHO were going to be discussing the Encino Project and collaborations with Wahlberg.

62.    During this meeting, Defendant Smith (in concert with Gallego) conspired to defraud, among others, Brian Summer ("Summer"), a crypto currency enthusiast, of $12,500. This scheme was perpetrated by Gallego and Defendant Smith by making false representations to Summer through creating video recordings of Thomas and Weinstein while they were meeting with Adeife at the Encino Mansion. This was done to falsely verify their association with Wahlberg to Summer. Photos and recordings were utilized to falsely purport Wahlberg's interest

in identifying and working with a cryptocurrency coin for marketing purposes, which Summer believed he would be the beneficiary of.

63.     Additionally, on June 10, 2021, Defendant Smith released a project designated as "4L" ("Project 3"), comprising of twenty (20) Master Recordings. This action was executed without the knowledge of Lipsey, and in the absence of any form of authorization or consent from Plaintiff in direct contravention of the Recording Agreement.

64.     On or around June 13, 2021, Adeife was apprised of the incident involving Summer, Defendant Smith, and his then-manager, Gallego, by counsel representing or associated with Wahlberg. Wahlberg's representative informed Adeife that the matter was to be escalated to the appropriate law enforcement authorities. Consequent to this incident, Weinstein and Thomas terminated all negotiations with both Plaintiff and EKHO regarding the Encino Project.

65.     Adeife informed Lipsey of the situation pertaining to Defendant Smith and Gallego and the response from Wahlberg's associates. As a result, Lipsey was counseled to abstain from any interference in potential ongoing investigations concerning Defendant Smith and/or Gallego or any other parties involved in the matter.

### *Defendant Smith Breaches the Recording Agreement by*
### *Releasing Music with Other Record Labels*

66.     Thereafter, Defendant Smith ceased all forms of communication with Lipsey and did not cure any of his breaches of the Recording Agreement, including the unauthorized release of Project 2 and Project 3. To mitigate losses from the Encino Project, Plaintiff diverted a significant portion of its efforts towards altering the utilization of the Encino Mansion and modifying the involvement of individuals associated with it. This undertaking caused Lipsey significant hardship and mental anguish, which led him to suffer severe depression.

67.     On information and belief, Plaintiff alleges that around September 2021, Defendant Smith released an album titled "Up 2 Me" ("Project 4") through a direct recording deal with record labels Interscope Geffen A&M ("IGA") and Foundation Media ("Foundation"), despite Plaintiff holding the exclusive rights to Defendant Smith's recording services.  Other record labels, namely Universal Music Group ("UMG") and IGA, knowingly pursued their deals with Defendant Smith without conducting any due diligence to ensure that Defendant Smith actually had the right to enter into any agreements with them.

68.     Plaintiff is unaware of the exact terms and conditions of Defendant Smith's direct recording deal with IGA/Foundation; however, the Recording Agreement between Plaintiff and Defendant Smith expressly provides that any deal for Defendant Smith's services would be furnished by Plaintiff and would result in

the required share of royalties, including those derived from records and ancillary income, being paid to Plaintiff.

69.    On information and belief, Plaintiff alleges that soon after Defendant Smith's recording deal ended with IGA/Foundation, Defendant Smith signed a direct recording agreement with Field Trip and The Kids in a joint venture deal with IGA. Plaintiff is unaware of the exact terms and conditions of Defendant Smith's recording deal with Field Trip/The Kids and/or their joint venture deal with UMG/IGA.

70.    On January 10, 2022, Plaintiff received an email from DistroKid, a music distribution company, that the record titled "Feel Like E.T." – as recorded by Defendant Smith and released by Plaintiff – had been taken down from all stores and streaming services because of a claim filed by UMG. The take down included all of Defendant Smith's music released and owned by Plaintiff under the Recording Agreement. Defendant Smith and the other record labels knew Plaintiff had distributed Defendant Smith's Project 1 and additional songs because Plaintiff's name was contained in the credits and liner notes.

71.    On or around February 11, 2022, a single titled "Still Countin" was disseminated by Defendant Smith. Subsequently, on February 18, Defendant Smith effected the release of an additional project entitled, "2 Alive" ("Project 5"), through the auspices of IGA, Field Trip, and The Kids. Project 5 was also released without

the authorization from Plaintiff or consent of Lipsey in breach of Artist's Recoding

Agreement with Plaintiff.

### *Defendant Smith's Rise to Fame at the Expense of Plaintiff's Efforts*

72.    During the following months, Defendant Smith rose to the top of the

rap/hip hop music industry and was widely hailed as a new star in the music scene.

Defendant Smith's success is significantly attributable to the endeavors of the

Plaintiff, who invested in a fledgling artist and expended substantial resources and

time to assure that Defendant Smith's brand and music would become more visible

to the public and upper echelon of artists in the music industry.

73.    As Defendant Smith experienced a rapid ascension to prominence

within the music industry, Plaintiff was left substantially uninformed and nearly

wholly excluded from all facets of Defendant Smith's career, including the accrual

of benefits as stipulated under the terms of the Recording Agreement.

74.    On information and belief, Plaintiff alleges that Defendant Smith and/or

any and all Doe Defendants is responsible for the unauthorized creation and

exploitation of the songs embodying Defendant Smith's performances found and

listed in **Exhibit "C"** attached hereto (collectively, the "Works"). The Works are

each commercial songs that have garnered millions (and, for some, billions) of plays

and streams, respectively and resulted in significant revenue and profits to

Defendants.

75.    On information and belief, Plaintiff alleges that Defendant Smith never sought or obtained a waiver, authorization, or consent from Plaintiff to furnish his recording services in which Plaintiff holds the exclusive right thereof, in connection with any of the Works.

*Plaintiff Addresses Defendant Smith's Breach Through Counsel*

76.    On or around October 18, 2023, Plaintiff's counsel sent a notice of breach and request for an accounting and production of documents to counsel for Defendant Smith. Various efforts have been exerted to establish contact with legal counsel representing Defendant Smith. Regrettably, these efforts were met with prolonged periods of non-response, occasionally interspersed with infrequent email replies suggesting that Defendant Smith's counsel will respond soon.

77.    On or around December 18, 2023, Plaintiff received a response letter from Defendant Smith's counsel. To Lipsey's surprise, Defendant Smith attempted to deny Plaintiff's claims as baseless and attempted to allege misconduct on the part of Plaintiff. Specifically, Defendant Smith alleges that Plaintiff invited Defendant Smith to Tennessee under the pretext of discussing career-enhancing opportunities like video shoots and music. Defendant Smith further alleges that upon Defendant Smith's arrival at Lipsey's residence, the situation reportedly devolved into a week of excessive partying marked by rampant alcohol and drug consumption. Defendant Smith alleges Lipsey sought to have Defendant Smith sign the Recording Agreement

with Plaintiff at this time, despite Defendant Smith's purported incapacity to make such decisions.

78.     These allegations are wholly false and alleged in bad faith as Defendant Smith was located at a separate residence in New York or New Jersey at the time of executing the Recording Agreement, and Plaintiff was at a separate residence in New York at the time of Defendant Smith's execution of the Recording Agreement. In addition, Plaintiff had only communicated with Defendant Smith about the Recording Agreement via cellular text and, upon information and belief, at all times, Defendant Smith held himself out as having full capacity and authority to sign at the time of his electronic execution of the Recording Agreement.

79.     Moreover, Defendant Smith – in an effort to intimidate and instill fear upon Plaintiff – attempts to cast a shadow on Plaintiff's business credibility in a defamatory manner by bringing up Lipsey's alleged past issues, none of which has any bearing or relevance on the issues put forth against Defendant Smith as provided herein.

80.     Upon information and belief, Plaintiff has paid hundreds of thousands of dollars, subject to amplification, in furtherance of recording, marketing, creating videos on behalf of, and otherwise promoting the name, image, and likeness of Defendant Smith. To date, Defendant Smith has never paid to Plaintiff any of the advances he's received or accounted to or paid earnings on revenues generated from

the exploitation of the above-referenced Works despite the requirement in the Recording Agreement to pay record royalties, publishing revenues and/or ancillary income to Plaintiff.

81. Indeed, despite the Recording Agreement's expressed provisions and in breach thereof, Artist has without limitation (a) authorized third parties other than Plaintiff to use Artist's name and likeness without Plaintiff's approval and engaged in the recording of music and exploitation of same without Plaintiff's authorization; (b) failed or refused to account and pay any amounts due to Plaintiff related to his Ancillary Activities; (c) failed or refused to account and report his income to Plaintiff in an intentional effort to avoid paying Plaintiff the amounts owed to Plaintiff; (d) authorized third party record labels and artist to release Artist's performances as a guest or feature artist on third-party master recordings without Plaintiff's approval; and (e) acted intentionally and in concert with Defendants and other third parties to deprive monies owed and rights granted to Plaintiff.

82. Artist utilizes a host of entities, including each defendant entity, to furnish his services and receive monies otherwise due to Plaintiff. The services of Artist, and the rights granted to Plaintiff under the Agreement, are unique and extraordinary in character, which gives them particular value, the loss of which cannot be reasonably or adequately compensated in damages in an action at law,

entitling Plaintiff to seek injunctive relief to enforce the provisions of the Agreement.

83.    Plaintiff has fully performed its obligations under the Recording Agreement and stands ready, willing and able to continue such full performance. Unable to sit by any longer while Defendant Smith continues to breach the Recording Agreement, Plaintiff was forced to initiate this action to enforce the terms of the Recording Agreement.

## COUNT I
## BREACH OF CONTRACT
## (AS TO DEFENDANT SMITH)

84.    Plaintiff re-incorporates and re-alleges the allegations set forth in paragraphs 1 through 83 of the Complaint as if fully set forth herein.

85.    As stated above, Plaintiff and Defendant Smith have a valid and enforceable agreement, and Plaintiff has fully performed all its obligations under the Recording Agreement.

86.    Plaintiff provided Defendant Smith with legal consideration under the Agreement, including remitting various advances and funding Defendant Smith's career and livelihood in an amount to be fully determined at trial.

87.    Both parties entered the Recording Agreement on their own volition, each party expressing a legitimate intention to be bound by the terms of the Recording Agreement.

88.    Defendant Smith has breached Section 1 of the Recording Agreement by negotiating and entering into recording agreements without Plaintiff's involvement. Section 1 of the Recording Agreement states that Defendant Smith shall render his services exclusively to Plaintiff.

89.    Pursuant to Section 3 of the Recording Agreement, Defendant Smith was obligated to record and deliver to Plaintiff an album comprising of at least 10 original new Master Recordings with a total duration of no less than 45 minutes. Additionally, under Section 6(a) of the Recording Agreement, Plaintiff was granted exclusive ownership of all recordings embodying Defendant Smith's performances made during the term of the Recording Agreement, and Section 6(b) conferred upon Plaintiff the exclusive distribution rights of such recordings.

90.    Defendant Smith breached the Recording Agreement by failing to fulfill his obligation to deliver the requisite album as defined in Section 3 of the Recording Agreement. Moreover, Defendant Smith further breached the Recording Agreement by entering into unauthorized agreements with third parties for the recording, live performing, and distribution of songs, for which Plaintiff holds the exclusive rights under Section 6(a) and 6(b) of the Recording Agreement. This conduct directly contravenes the exclusivity provisions of the Recording Agreement.

91.    Defendant Smith has also breached Section 13(b)(i) of the Recording Agreement, which prevents Defendant Smith from entering into any agreement that

would interfere with Defendant Smith's obligations under the Recording Agreement. Defendant Smith breached this provision by entering recording agreement with the third parties, including some unknown to Plaintiff.

92.    In addition, Defendant Smith has breached Section 7 of the Recording Agreement by failing to pay the required percentages of recording and ancillary income required under the express terms of the Recording Agreement to Plaintiff.

93.    As discussed fully above, Defendant has made it clear that he will no longer be bound by the terms of the Recording Agreement and will not honor the remainder of the terms contained therein.

94.    By reason of the foregoing and other acts not presently known by Plaintiff, Defendant Smith has knowingly and materially breached his contractual obligations to Plaintiff under the Recording Agreement, causing Plaintiff considerable damages.

95.    Defendant Smith's material breach of the Recording Agreement is the legal cause of substantial damage to Plaintiff. Plaintiff seeks an order requiring Defendant Smith's specific performance of the Recording Agreement and payment for all monies collected that have not been paid to Plaintiff and to which Plaintiff is entitled under the terms of the Recording Agreement.

96.    As a proximate result of Defendant Smith's breaches of contract, Plaintiff has suffered significant monetary damages in an amount to be proven at trial, plus prejudgment interest.

### COUNT II
### BREACH OF THE COVENANT OF
### GOOD FAITH AND FAIR BUSINESS DEALING
### (AS TO DEFENDANT SMITH)

97.    Plaintiff re-incorporates and re-alleges the allegations set forth in paragraphs 1 through 96 of the Complaint as if fully set forth herein.

98.    Generally, there is an implied covenant of good faith and fair dealing in every contract, whereby neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

99.    The scope of conduct prohibited by the covenant of good faith is circumscribed by the purposes and express terms of the contract. Where one party acts arbitrarily, capriciously, or unreasonably, that conduct exceeds the justifiable expectations of the second party.

100.    Plaintiff and Defendant Smith have a valid and enforceable agreement, and Plaintiff has fully performed all its obligations under the Recording Agreement.

101.    Defendant Smith's actions as described above subverted the contractual objectives and benefits entitled to Plaintiff under the Recording Agreement. Specifically, Defendant Smith's unauthorized engagements with third parties, as

well as the production and distribution of recordings outside of the Agreement, directly undermined the exclusivity and benefits that Plaintiff was entitled to receive under the Recording Agreement. These actions are contrary to the spirit of the covenant of good faith and fair dealing.

102.    Defendant Smith, by and through his conduct and actions described in this Complaint, has wrongfully withheld the benefits of the Recording Agreement from Plaintiff. Such actions frustrated the purpose of the Recording Agreement.

103.    Thus, Defendant Smith breached the Agreement with Plaintiff and the covenant of good faith and fair dealing in the Agreement.

104.    Defendant Smith's breach is not the result of an honest mistake, bad judgment or negligence, but rather a conscious, selfish, and deliberate act, which unfairly frustrates the agreed common purpose and disappoints the reasonable expectations of Plaintiff, depriving Plaintiff of the benefit of the Recording Agreement.

105.    As a direct and proximate result of Defendant Smith's actions in wrongfully withholding the benefits of the Recording Agreement from Plaintiff and frustrating the purpose of the Recording Agreement, Plaintiff has been damaged in an amount to be determined at the time of trial, plus prejudgment interest.

## COUNT III
## ACCOUNTING AND DISGORGEMENT OF PROFITS
## (AS TO ALL DEFENDANTS)

106.    Plaintiff re-incorporates and re-alleges the allegations set forth in paragraphs 1 through 105 of the Complaint as if fully set forth herein.

107.    Defendant Smith has an obligation to account for and pay to Plaintiff a percentage of all revenue sources set forth in the Recording Agreement.

108.    Defendant Smith has failed to account for or pay such revenues despite earning revenues for the sources contemplated by the Recording Agreement.

109.    As a proximate result in failing to disclose required accounting, Plaintiff has been harmed and is therefore unaware of total monies currently owed to Plaintiff.

110.    Plaintiff is entitled to receive a full accounting identifying each source of income and the amounts of such income.

111.    Plaintiff seeks disgorgement of all profits earned by Defendant Smith and any collaborating third parties from the breach of the Recording Agreement. The exact amount of these profits is to be determined following an accounting.

112.    Plaintiff demands a full accounting of all business transactions and activities related to Defendant Smith's services and career, including all accounts receivable and payable, all bank account statements, all ledgers or other records indicating the gross receipts and all expenses, all bills or invoices, and all other

financial information that will provide and allow for a full accounting of the total monies currently owed to Plaintiff from the breach of the Recording Agreement and disgorgement of all such profits to Plaintiff.

## COUNT IV
## DECLARATORY JUDGMENT
## (AS TO ALL DEFENDANTS)

113.   Plaintiff re-incorporates and re-alleges the allegations set forth in paragraphs 1 through 112 of the Complaint as if fully set forth herein.

114.   Pursuant to 28 U.S.C. § 2201, this Court may declare the rights and other legal relations of any interested party petitioning for such declaration, whether or not further relief is or could be prayed; and the declaration shall have the force and effect of a final judgment or decree and be reviewable as such.

115.   An actual controversy has arisen and now exists between Plaintiff and Defendant Smith concerning their respective rights and obligations under the Recording Agreement. Defendant Smith's actions, including entering into agreements with third parties in alleged violation of the exclusive rights granted to Plaintiff under the Recording Agreement, have created a dispute necessitating judicial determination.

116.   Plaintiff seeks a declaration that the Recording Agreement remains a valid and enforceable agreement between the parties thereto.

117.  Plaintiff further seeks a declaration that, pursuant to the Recording Agreement, Defendant Smith is contractually bound to perform under the terms of the Recording Agreement.

## COUNT V
## TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS
## (AS TO DEFENDANT SMITH)

118.  Plaintiff re-incorporates and re-alleges the allegations set forth in paragraphs 1 through 117 of the Complaint as if fully set forth herein.

119.  The purpose of Plaintiff leasing the Encino Mansion was to advance Defendant Smith's music career by providing a hub to produce music, create content with influencers, and undertake television and film projects.

120.  Defendant Smith, in concert with his former manager and other parties, engaged in actions that completely undermined the purpose of the Encino Mansion. His conduct, including conspiring to defraud parties and misrepresent associations with Wahlberg, severely impacted Plaintiff's business relations and economic advantage. These actions resulted in the termination of negotiations and potential projects, directly harming Plaintiff's investment and business opportunities related to the Encino Mansion.

121.  Defendant Smith's actions were and are not protected by any privilege.

122.  Plaintiff leased the Encino Mansion to use in pursuance of discharging the Recording Agreement, and uplifting the professional trajectory of Defendant

Smith, but Defendant Smith used the Encino Mansion to commit fraud and take unfair advantage by victimizing Mr. Summer and others, compromising one of Plaintiff's valued relationships.

123.    Defendant Smith's actions constitute intentional and unjustified interference with Plaintiff's contractual relations and prospective economic advantage. The intentional nature of Defendant Smith's actions and the resulting damage to Plaintiff's business prospects and contractual relationships form the basis of this tort claim.

124.    Plaintiff has suffered and continues to suffer considerable and irreparable financial harm, including lost business opportunities and damage to business relationships, as a direct result of Defendant Smith's conduct.

## COUNT VI
## TORTIOUS INTERFERENCE WITH A CONTRACT
## (AS TO DEFENDANTS THE KIDS AND FIELD TRIP)

125.    Plaintiff re-incorporates and re-alleges the allegations set forth in paragraphs 1 through 124 of the Complaint as if fully set forth herein.

126.    Plaintiff maintained a contractual relationship with Artist through the Recording Agreement.

127.    Despite notice of Plaintiff's contractual relationship with Artist, Defendants, The Kids and Field Trip entered into a distribution agreement directly

with Artist exploiting the Works cited herein, with full intent to circumvent the rights of Plaintiff.

128.   Despite notice of Plaintiff's contractual relationship with Artist, Artist has acted intentionally and in concert with Defendants, The Kids, Field Trip and others to deprive monies owed and rights granted to Plaintiff.

129.   As a result of Defendants' tortious interference with the contractual relationships of Plaintiff, Plaintiff has suffered irreparable injury and money damages in an amount to be proven at trial, plus prejudgment interest.

130.   Plaintiff is entitled to compensatory damages, punitive damages, and prejudgment interest for the losses incurred due to Defendants Kids and Field Trip's tortious interference in an amount to be proven at trial.

## COUNT VII
## FRAUDULENT MISREPRESENTATION
## (AS TO DEFENDANT SMITH)

131.   Plaintiff re-incorporates and re-alleges the allegations set forth in paragraphs 1 through 130 of the Complaint as if fully set forth herein.

132.   Defendant Smith, through his actions and communications with Lipsey and Cam, materially misrepresented the status of his contractual obligations and rights under his agreement with Streamcut by stating that he did not have an agreement with the company and that he was free to enter into a contract with Plaintiff.

133.    At the time Defendant Smith made these representations, Defendant Smith either knew they were false or made the representations with reckless disregard for their truth or falsity.

134.    Defendant Smith's misrepresentations were made with the intent to deceive and induce reliance by Plaintiff, resulting in the execution of the Recording Agreement, which was detrimental to Plaintiff's rights and interests.

135.    Plaintiff relied upon these misrepresentations to Plaintiff's detriment.

136.    As a direct and proximate cause of Defendant Smith's fraudulent misrepresentations, Plaintiff has suffered and will continue to suffer irreparable injury, including, but not limited to financial losses, loss of business opportunities, and injury to its reputation and goodwill.

137.    Plaintiff is entitled to compensatory and punitive damages in an amount to be determined at trial, plus prejudgment interest.

## COUNT VIII
## NEGLIGENT MISREPRESENTATION
## (AS TO DEFENDANT SMITH)

138.    Plaintiff re-incorporates and re-alleges the allegations set forth in paragraphs 1 through 137 of the Complaint as if fully set forth herein.

139.    Defendant Smith made false statements or omissions of material facts to Plaintiff. Defendant Smith, under the standard of reasonable care under the circumstances, was alternatively negligent in making the statements or omissions

because Defendant Smith should have known the statements were false or the omissions were false or misleading.

140.  Defendant Smith, in making the false statements and omissions, intended to induce Plaintiff to rely or act on the statements.

141.  Plaintiff did so rely and act on the false statements and misrepresentations or omissions and has suffered damages in amount to be proven at trial.

142.  Plaintiff's reliance on Defendant Smith's false statements and misrepresentations or omissions were reasonable and justifiable under the circumstances; and as a result of the false statements and misrepresentations or omissions Plaintiff has incurred monetary damages as well as attorney's fees and costs.

143.  As a direct and proximate result of Defendant Smith's conduct, Plaintiff has been damaged in an amount to be determined at trial, plus prejudgment interest.

<u>**COUNT IX**</u>
<u>**PROMISSORY ESTOPPEL**</u>
<u>**(AS TO DEFENDANT SMITH)**</u>

144.  Plaintiff re-incorporates and re-alleges the allegations set forth in paragraphs 1 through 143 of the Complaint as if fully set forth herein.

145.  Defendant Smith, through various communications and actions, implicitly and explicitly made commitments to adhere to the terms and conditions

of the Recording Agreement with Plaintiff, which constituted a promise for the purposes of promissory estoppel.

146.   Defendant Smith should have reasonably expected the Plaintiff to rely on such promises.

147.   Plaintiff did, in fact, reasonably rely on these promises by Defendant Smith, undertaking significant investments in Defendant Smith's career, including but not limited to financial expenditures, resource allocation, and opportunity costs.

148.   As a direct consequence of this reliance, Plaintiff has suffered substantial detriment, including financial losses and missed business opportunities, due to Defendant Smith's failure to fulfill his promises as understood in the context of their working relationship and the Recording Agreement.

149.   Enforcing Defendant Smith's promise is necessary to avoid injustice, given the significant detriment suffered by Plaintiff due to its reliance on Defendant Smith's commitments.

150.   Plaintiff seeks an order enforcing the commitments made by Defendant Smith as construed under the doctrine of promissory estoppel. The Plaintiff further requests for damages in an amount to be determined at trial, plus prejudgment interest.

## COUNT X
## UNJUST ENRICHMENT
## (AS TO ALL DEFENDANTS)

151.   Plaintiff re-incorporates and re-alleges the allegations set forth in paragraphs 1 through 150 of the Complaint as if fully set forth herein.

152.   Plaintiff and Defendant Smith are parties to a valid and enforceable exclusive recording artist agreement.

153.   Under the Recording Agreement, Plaintiff provided significant investment in Defendant Smith's career, including but not limited to financial advances, marketing and promotional efforts, recording studio access, and the use of the Encino Mansion for professional purposes.

154.   Defendant Smith has received substantial benefits and advantages from Plaintiff's contributions, including heightened career visibility, increased revenue streams, and industry recognition.

155.   Defendant Smith's music releases under the terms of the Recording Agreement have been commercially successful, generating considerable revenue, directly attributable to Plaintiff's investments and efforts.

156.   Defendant Smith has retained these financial and professional benefits without proper remuneration to Plaintiff, resulting in unjust enrichment.

157.   It is inequitable for Defendant Smith to be unjustly rewarded for his wrongful conduct and to be enriched to Plaintiff's detriment.

158.  Plaintiff has suffered damages due to Defendant Smith's unjust retention of benefits and profits that equitably and legally should be returned to Plaintiff.

159.  Plaintiff seeks restitution and damages for the profits unjustly retained by Defendant Smith, in accordance with the principles of equity and fairness as recognized by law.

**COUNT XI**
**CONVERSION**
**(AS TO ALL DEFENDANTS)**

160.  Plaintiff re-incorporates and re-alleges the allegations set forth in paragraphs 1 through 159 of the Complaint as if fully set forth herein.

161.  Defendant Smith has exercised unauthorized control over property belonging to Plaintiff. This property includes, but is not limited to, Master Recordings, compositions, and related intellectual property developed under the terms of the Recording Agreement.

162.  Defendants have intentionally exercised unauthorized dominion or control over Plaintiff's property and the right to license and exploit the unauthorized Master Recordings identified herein so seriously as to interfere with Plaintiff's right to control of such property without authorization from Plaintiff.

163.  Defendant Smith, by engaging in agreements with third parties, has effectively assumed rights and control over said property without the authorization or consent of Plaintiff.

164.  The Recording Agreement between Plaintiff and Defendant Smith grants Plaintiff exclusive rights to the property in question, including the recordings, compositions, and associated intellectual property.

165.  Defendants have retained the revenue received from the unauthorized use of the Master Recordings identified herein and have failed and refused to turn over any of such revenue to Plaintiff.

166.  By acting outside the bounds of the Agreement and utilizing the property for unauthorized purposes, Defendant Smith has deprived Mega Millions of its rightful control and use of its property.

167.  Plaintiff is entitled to the revenue from the licensing and exploitation of the unauthorized Master Recordings identified herein.

168.  In addition, Defendants have harmed the Master Recordings released by Defendants which are the property of Plaintiff, by allowing such records to be used in a manner not authorized by Plaintiff.

169.  As a direct result of Defendants', Plaintiff has suffered damages in the form of lost revenues, diminished value of property, and impairment of its exclusive rights.

170.    Plaintiff seeks to recover the full value of the converted property, as well as any additional damages caused by the unauthorized use of said property in an amount to be determined at trial, plus prejudgment interest.

## COUNT XII
## INJUNCTIVE RELIEF
## (AS TO ALL DEFENDANTS)

171.    Plaintiff re-incorporates and re-alleges the allegations set forth in paragraphs 1 through 170 of the Complaint as if fully set forth herein.

172.    Plaintiff asserts that it has suffered and will continue to suffer irreparable harm that cannot be adequately compensated by monetary damages alone due to Defendant Smith's actions in breach of the Recording Agreement. This harm includes, but is not limited to, loss of control over exclusive rights, damage to Plaintiff's reputation and business relationships, and ongoing infringement of intellectual property rights.

173.    Defendant Smith's unauthorized agreements and activities with third parties, including, but not limited to UMG, IGA, Field Trip and The Kids, constitute a violation of the exclusive rights granted to Plaintiff under the Recording Agreement.

174.    Such actions, if not enjoined, will result in continued infringement and dilution of Plaintiff's rights and properties, causing further irreparable harm.

175.    Plaintiff demonstrates a likelihood of success on the merits of its claims, as detailed in the preceding counts of this Complaint.

176.    The balance of hardships tips decidedly in favor of Plaintiff, as Defendant Smith's compliance with the Recording Agreement and cessation of infringing activities imposes minimal hardship in comparison to the ongoing, severe, and irreparable harm suffered by Plaintiff.

177.    Plaintiff seeks a preliminary and permanent injunction enjoining Defendant Smith and any affiliated parties from engaging in any further activities that violate the terms of the Recording Agreement. Plaintiff further requests an order compelling Defendant Smith to cease distribution and any commercial exploitation of the works and properties subject to the exclusive rights of Plaintiff under the Recording Agreement.

## COUNT XIII
## FALSE DESIGNATION OF ORIGIN AND UNFAIR COMPETITION UNDER 15 U.S.C. § 1125(a)
## (AS TO ALL DEFENDANTS)

178.    Plaintiff re-incorporates and re-alleges the allegations set forth in paragraphs 1 through 174 of the Complaint as if fully set forth herein.

179.    Defendant Smith, along with other third parties, has engaged in commercial activities that falsely represent the origin of the music, recordings, and compositions that are contractually and lawfully owned or controlled by Plaintiff, thus constituting a false designation of origin in violation of 15 U.S.C. § 1125(a).

47

180.   The actions of Defendant Smith and others in releasing, distributing, and promoting albums, singles, and EPs without the consent of Plaintiff have created a likelihood of confusion, mistake, or deception with respect to the origin, sponsorship, or approval of these works, misleading the public and industry professionals.

181.   As a direct result of these actions, Plaintiff has suffered and continues to suffer damages in the form of lost revenue, harm to its business reputation, and diminution of the value of its contractual rights and intellectual property.

182.   Plaintiff respectfully requests the Court enter an injunction preventing further false designation of origin and unfair competition by Defendant Smith and others.  Plaintiff is further entitled to damages for the injury caused to Plaintiff, including lost profits, in an amount to be proven at trial and Attorneys' fees and costs pursuant to 15 U.S.C. § 1117.

## COUNT XIV
## PUNITIVE DAMAGES
## (AS TO ALL DEFENDANTS)

183.   Plaintiff re-incorporates and re-alleges the allegations set forth in paragraphs 1 through 182 of the Complaint as if fully set forth herein.

184.   Defendants' conduct described above constitutes willful misconduct, malice, fraud, wantonness, oppression or that entire want of care that would raise the

presumption of conscious indifference to consequences and entitle Plaintiff to punitive damages in an amount to be proved at trial.

185.   Plaintiff, therefore, prays for exemplary and punitive damages to deter Defendants from such wrongful and fraudulent conduct in the future.

## COUNT XV
## ATTORNEYS FEES AND COSTS
## (AS TO ALL DEFENDANTS)

186.   Plaintiff re-incorporates and re-alleges the allegations set forth in paragraphs 1 through 185 of the Complaint as if fully set forth herein.

187.   Regarding all of the acts complained of herein, Defendants have acted intentionally and/or and in bad faith and have caused Plaintiff unnecessary trouble and expense.

188.   Plaintiff attempted to resolve this matter prior to initiating litigation; however, Defendants refused, continuing their stubbornly litigious conduct, and causing Plaintiff additional unnecessary trouble and expense.

189.   Accordingly, Plaintiff is entitled to an award of their attorneys' fees and expenses of litigation in this action, against Defendants, jointly and severally.

## PRAYERS FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests:

1.      a jury trial on this lawsuit;

2.      a declaratory judgment that the Recording Agreement between Plaintiff and Defendant Smith is valid, enforceable, and binding, and that the terms and obligations therein continue to apply to Defendant Smith and are not superseded by any subsequent agreements with the Defendants or their affiliates;

3.      damages sustained due to the breach of contract by Defendant Smith, as proven at trial, including but not limited to, lost profits, royalties, and other monetary losses resulting from the unauthorized use and distribution of musical works;

4.      damages, including punitive damages, caused by Defendant Smith's breach of the covenant of good faith and fair business dealing, in an amount to be determined at trial;

5.      a full accounting and disgorgement of all profits earned by Defendant Smith and other Defendants from the unauthorized exploitation of Plaintiff's exclusive rights, and for the award of such profits to Plaintiff;

6.      compensatory and punitive damages resulting from Defendant Smith's tortious interference with Plaintiff's economic advantage and business relations, particularly concerning the Encino Mansion and the Encino Project;

7.      restitution and repayment of all benefits unjustly received by Defendant Smith and other Defendants as a result of their actions, to be paid to Plaintiff;

8.    compensatory damages for the conversion of Plaintiff's property rights, in an amount to be proven at trial;

9.    a preliminary and permanent injunction prohibiting Defendant Smith and other Defendants from further breach of the Recording Agreement and from further unauthorized use and exploitation of Plaintiff's rights;

10.    compensatory and punitive damages due to fraudulent misrepresentations made by Defendant Smith, as proven at trial;

11.    damages resulting from Defendant Smith's breach of promises upon which Plaintiff reasonably relied, in an amount to be determined at trial;

12.    damages, including statutory damages under 15 U.S.C. § 1125(a), caused by the false designation of origin and unfair competition by Defendants, and for an order enjoining such future conduct;

13.    the recovery of all costs and reasonable attorney' fees incurred by Plaintiff in the prosecution of this action;

14.    pre- and post-judgment interest on any monetary awards, at the highest rate allowed by law; and

15.    such other and further relief as the Court may deem just and proper under the circumstances.

Respectfully submitted this 12th day of November, 2024.

_/s/ John T. Rose_
John T. Rose

51

                                        Georgia Bar No. 488623
                                        Leron E. Rogers
                                        Georgia Bar No. 482620
                                        Paul N. Bowles
                                        (To be admitted *Pro Hac Vice*)

FOX ROTHSCHILD LLP
999 Peachtree Street, N.E.
Suite 1500
Atlanta, GA 30309
Tel: (404) 881-5941
Fax: (404) 962-1200
Email: jrose@foxrothschild.com
        lrogers@foxrothschild.com
        pbowles@foxrothschild.com

                                        */s/ Joseph Adeife*
                                        Joseph Adeife
                                        (CA Bar # 338444)
                                        (To be admitted *Pro Hac Vice*)

THE LAW OFFICE OF JOSEPH ADEIFE PC.
1288 Paseo Rancho Serrano
Thousand Oaks, CA 91632
Tel: (305) 923-3438
Email: josephadeifelaw@gmail.com         *Counsel for Plaintiff*

<u>**CERTIFICATE OF COMPLIANCE**</u>

Pursuant to LR 71(D), N.D.Ga., I hereby certify that the foregoing has been prepared in compliance with Local Rule 5.1(B) in 14-point New Times Roman typeface.

Respectfully submitted this 12th day of November, 2024.

<u>*/s/ John T. Rose*</u>
John T. Rose
Georgia Bar No. 488623
Leron E. Rogers
Georgia Bar No. 482620
Paul N. Bowles
(To be admitted *Pro Hac Vice*)

FOX ROTHSCHILD LLP
999 Peachtree Street, N.E.
Suite 1500
Atlanta, GA 30309
Tel: (404) 881-5941
Fax: (404) 962-1200
Email: jrose@foxrothschild.com
        lrogers@foxrothschild.com
        pbowles@foxrothschild.com

<u>*/s/ Joseph Adeife*</u>
Joseph Adeife
(CA Bar # 338444)
(To be admitted *Pro Hac Vice*)

THE LAW OFFICE OF JOSEPH ADEIFE PC.
1288 Paseo Rancho Serrano
Thousand Oaks, CA 91632
Tel: (305) 923-3438
Email: josephadeifelaw@gmail.com          *Counsel for Plaintiff*